(806 P.2d 1014)

No. 65,136

# In The Matter of The Estate of CHESTER D. CRAWSHAW, Deceased.

Petition for review granted April 23, 1991.

Opinion filed March 1, 1991.

*Richard D. Ewy* and *Timothy B. Mustaine*, of Foulston & Siefkin, of Wichita, for the appellant Salvation Army, Wichita, Kansas.

*Paul S. Gregory*, of Gregory & Gregory, of Osborne, for the appellee Paul S. Gregory, Administrator CTA.

*Daniel K. Diederich* and *Thomas J. Kennedy*, of Kennedy, Berkley, Yarnevich & Williamson, Chartered, of Salina, for the appellees Marymount College of Kansas and Marymount Memorial Educational Trust Fund.

Before DAVIS, P.J., LEWIS, J., and FLOYD H. COFFMAN, District Judge Retired, assigned.

DAVIS, J.: Chester D. Crawshaw left the bulk of his estate in trust to Marymount College in Salina, Kansas, for school loans to nursing students under conditions set forth in his testamentary trust. Soon after his death, Marymount College terminated its existence. The trial court, applying the cy pres doctrine under K.S.A. 1989 Supp. 59-22a01, named a successor trustee to administer the funds for the same educational purposes. The remaining residuary legatee, the Salvation Army, appeals, contending that the trial court erred by applying cy pres because the language in the decedent's testamentary trust evidenced a specific charitable intent to benefit students at Marymount College, not a general charitable intent. We affirm.

The case was submitted to the trial court on the following stipulated facts:

### Stipulated Facts

"1. Chester D. Crawshaw, a resident of Osborne, Kansas, died testate on May 4, 1989. On May 12, 1989 his Last Will and Testament (attached as Exhibit 'A') was admitted to probate in Osborne County District Court, Probate Division. (Petition to Probate Will). Paul S. Gregory was appointed as administrator with Will annexed. (Letters Testamentary).

"2. The Last Will and Testament of Chester D. Crawshaw provides for the distribution of the personal effects of the deceased, and further provides for certain legacies to four individuals, said legacies totaling $350.00. (Last Will and Testament). The residuary estate is valued in excess of $140,000.00. (Inventory and Appraisement).

"3. Upon distribution of these bequests and legacies, the Will directs that the personal property and real property remainder of the estate be sold and converted to cash and that the proceeds be distributed as follows:

"A. I direct that said Executor first pay all of my just debts, including my funeral expenses and expenses of my last sickness, and the costs of administering my estate, and all legacies provided for by this, my Last Will and Testament.

"B. I give, devise and bequeath fifteen percent (15%) of the rest, residue and remainder of the funds, proceeds and property of my estate to the Salvation Army, with Kansas office at Wichita, Kansas, to be used by it as it shall deem fit, without any restrictions whatever.

"C. I give, devise and bequeath the remaining eighty-five percent (85%) of the rest, residue and remainder of the funds, proceeds and property of my estate to Marymount College, located at Salina, Kansas, in trust, or in the event that said college does not have the legal capacity to accept and administer the herein created trust, then in trust, to the ·official Board or Association of said college having the legal capacity to accept and administer the herein created trust, in any event hereinafter referred to as Trustee, and that said trust is created for the purposes, and subject to the conditions, hereinafter stated:

"1. That such trust fund, with its accretions, shall perpetually be called and known as the 'Mary Anna and Chester D. Crawshaw Trust Fund'.

"2. That said trust fund shall be paid to said legatee and devisee by my Executor at the time of the final settlement of my estate.

"3. The funds herein provided for may be loaned to students in the nursing department of said college. If there are no eligible candidates in said nursing department for this fund in any academic year, then the administrators may grant a loan to any other student or students attending said college.

"4. The administration of the fund shall be left entirely to the Trustee.

"5. Any and all loans made from said fund shall be evidenced by a note for the amount, and stating the terms of such loan, and signed by the person receiving such loan. Any such note shall not bear interest during the time such loan recipient is in regular attendance at said college, and is satisfactorily carrying a normal school load. The note of any loan recipient shall draw interest as shall be fixed by the Trustee, and shall bear interest from date of graduation of such loan recipient, or from the time any loan recipient shall fail to attend, or shall withdraw from, said college, or from the time any loan recipient shall fail to make grades acceptable, or required, for graduation. The principal of each note, with interest, shall be due and payable in four equal annual installments, following the graduation of said loan recipient from college, or from the date of his or her withdrawal from college, or from the end of the semester in which he or she fails to make satisfactory passing grades. For good cause shown, the Trustee may extend the time of payment of any note. When interest is received on any note, it shall be added to, and become a part of, the principal of said trust fund, and shall be used in the same manner as the original amount. Additions to the trust fund may be made from time to time by any person, persons, firms or corporations desiring to do so.

(Last Will and Testament of Chester D. Crawshaw)

"4. Chester D. Crawshaw was not Catholic but his deceased wife was Catholic and they were married in the Catholic Church. Chester D. Craws-

haw received a Methodist burial service. Chester D. Crawshaw was not a Marymount College alumni, director, employee, former employee, teacher, or former teacher, nor is it known that he had any other type of special personal relationship with Marymount College.

"5. Effective June 30, 1989 Marymount College of Kansas terminated its nursing department and all other departments, programs and curricula offered at its campus in Salina, Kansas. (Petition of Marymount College, Par. 5).

"6. Marymount College of Kansas is now and at all times pertinent herein and has been a not-for-profit Kansas corporation. Although its Articles of Incorporation were forfeited on March 15, 1989 for failure to timely file its annual report, its Articles of Incorporation were renewed and revived in accordance with K.S.A. 17-7002 and K.S.A. 17-6003 with the same force and effect as if said Articles of Incorporation had not been forfeited. Attached hereto as Exhibit 'B' is a Certificate of Good Standing issued by the Secretary of State of Kansas.

"7. The termination of the nursing department and other departments and academic programs at Marymount College of Kansas make the Decedent's bequest to Marymount College impossible and impracticable of fulfillment, and the Decedent makes no provision for any alternative plan of disposition in the event Marymount College of Kansas should cease operations as an institution of higher learning. (Petition of Marymount College, Par. 5).

"8. The Marymount Memorial Educational Trust Fund (hereinafter referred to as 'MMETF') was established on September 13, 1989 by and between Marymount College of Kansas and George K. Fitzsimons, Bishop of the Roman Catholic Diocese of Salina in Kansas. (Petition of Marymount College, Par. 7; and MMETF Trust Agreement (Exhibit 'C')).

"9. On September 19, 1989 Marymount College petitioned the Saline County District Court and obtained an Order that the MMETF Trust Agreement was a proper and suitable trust arrangement to carry out the general charitable intention of those settlors and testators of certain endowment and scholarship funds specifically identified by name in the Exhibit 'A' to Marymount College's petition therein, as well as the general charitable intention of the settlors and testators of any other separate endowment or scholarship fund which may be held by Marymount College for which no alternative plan of disposition was provided. (Petition of Marymount College, Par. 7; Marymount College Petition filed in Saline County District Court (Exhibit 'D'); Order of Saline County District Court (Exhibit 'E')).

"10. The Mary Anna and Chester D. Crawshaw Trust Fund had not yet been funded when the Marymount Educational Trust Fund agreement was signed. Therefore, the Mary [Anna] and Chester D. Crawshaw Trust Fund was not one of those trust funds named in the Exhibit 'A' list attached by Marymount College to its petition to the Saline County District Court and incorporated by reference in the Order thereto. (Petition of Marymount

College, Par. 7; Marymount College Petition filed in Saline County District Court (Exhibit 'D'); Order of Saline County District Court (Exhibit 'E'))."

"11. FHSU Endowment Association is a not-for-profit corporation and the objects and purposes to be transacted and carried on by said Endowment Association are as follows:

> To raise funds for the purposes for which this corporation is created; to support educational undertakings at Fort Hays State University and to receive and hold in trust any property, real and personal, given, devised, bequeathed, given in trust, or in any other way transferred to this corporation for the use and/or benefit of Fort Hays State University, or of any student or employee therein as such, or of any school, division, department or branch thereof or for the carrying on at said institution of any line or work, teaching or investigation which the donor, grantor or testator may designate (Petition of FHSU Endowment Association, Par. 8).

"12. Fort Hays State University has an established School of Nursing that offers both a bachelors and a masters degree in nursing. (Petition of FHSU Endowment Association, Par. 9)."

Based upon the stipulated facts and evidence upon hearing, the trial court concluded:

"[W]hen Chester D. Crawshaw made the bequest, . . . he had a general charitable intent to benefit nursing students and other students, and the named trustee, Marymount College, was only an agent for effectuating this general charitable purpose. Since the testator had general charitable intent with respect to this bequest, the court finds that the doctrine of *cy-pres* as codified by the Kansas Legislature in K.S.A. 59-22a01, is applicable. Accordingly, the court orders an administration of this trust which will nearly as possible fulfill the testator's manifested general charitable intent. After considering alternative proposals from Marymount Memorial Educational Trust Fund, Fort Hays State University Endowment Association and the Salvation Army, the court determines that the administration of this bequest which would nearly as possible fulfill the manifested general charitable intent of the testator is to have the trust administered as part of the Marymount Memorial Educational Trust Fund."

Our scope of review is de novo because the facts were submitted by stipulation and because the construction of a written instrument is a question of law. *Lightner v. Continental Life Ins. Co.*, 242 Kan. 29, 31, 744 P.2d 840 (1987); *Farmers Ins. Co., Inc. v. Gilbert*, 14 Kan. App. 2d 395, 396, 791 P.2d 742 (1990).

The testamentary trust in question provided for no alternate disposition. "In Kansas the rule of common law, that a lapsed or void devise goes to the heirs of the testator, has been abrogated and a void devise falls into the residuum and will be disposed

of by the residuary clause if one has been provided." *Trustees of Endowment Fund of Hoffman Memorial Hosp. Ass'n v. Kring,* 225 Kan. 499, 506, 592 P.2d 438 (1979). In this case, there is a residuary clause with two provisions: The first was a bequest to the Salvation Army; the second was the creation of the trust that is the subject of this action. If the trust fails, all proceeds would be distributed to the remaining residuary legatee, the Salvation Army. See 225 Kan. at 506.

The Salvation Army argues that the trial court erred in construing Crawshaw's will and in determining that there was a general charitable intent rather than a specific charitable intent. The testamentary trust provides that the funds "may be loaned to students in the nursing department of said college" and if there are no eligible nursing students, then to any other student or students attending said college. Based on this language, the Salvation Army contends that the trust "clearly and unambiguously demonstrates specific intent to benefit nursing and other students at Marymount College."

In support of its argument, the Salvation Army relies upon three cases, none of which deal with the interpretation or construction of a charitable testamentary trust: *In re Trust Estate of Rivas,* 233 Kan. 898, 666 P.2d 691 (1983); *In re Estate of Wernet,* 226 Kan. 97, 596 P.2d 137 (1979); and *In re Estate of Groves,* 203 Kan. 762, 457 P.2d 71 (1969). In focusing upon the specific language decedent used in drafting his testamentary charitable trust, the Salvation Army fails to give consideration to the will as a whole. Crawshaw's estate totaled about $140,350. His will included four specific bequests totaling $350, while the $140,000 residuary was left entirely to charity. The residuary estate was divided between two organizations—15% to the Salvation Army outright and 85% to Marymount College in trust. Under these circumstances, we would be remiss if we did not consider those Kansas cases dealing with the interpretation and construction of charitable bequests.

In the case of *In re Estate of Roberts,* 190 Kan. 248, 373 P.2d 165 (1962), the court said:

"Charitable trusts are favorites of the law; they must be upheld whenever possible and, once it has been determined that the provisions of a will create a charitable trust, those provisions and others to be found in the instrument

must be liberally construed for the purpose of carrying out the intention of the donor. Technical rules of construction, which have often prevented conveyances or bequests from taking effect, are disregarded. [Citations omitted.]" 190 Kan. at 255.

Again, in the case of *In re Estate of Freshour*, 185 Kan. 434, 441, 345 P.2d 689 (1959), the Supreme Court said:

"When once a devise or grant is determined to constitute a charitable trust, courts look with liberality on the instrument creating it for the purpose of carrying out the intention of the donor. Technical rules of construction, which have often prevented conveyances or bequests from taking effect, are disregarded. [Citations omitted.] Moreover, when it is ascertained that the donor intended to create a public charity it will not be allowed to fail because the trustee is . . . incapable of taking."

As early as 1907, Kansas recognized that bequests for educational purposes are in the nature of a public charity and should be regarded with special favor in the law.

"Bequests for educational purposes have been regarded by the courts of this country with special favor, and donations made for the founding and maintenance of institutions of learning or for increasing educational facilities have very generally been upheld as public charities. . . .

. . . .

"The advantages, direct and indirect, which the highly educated citizen imparts to the general public cannot be estimated. Every advancement made in the scientific, mechanical, moral, literary, or other pursuits of life adds to the general sum of human knowledge, comfort and happiness. As higher education increases civilization advances. The elevating and beneficient influences which the general public receives from educational sources make every citizen a beneficiary thereof, and furnish complete justification for placing every educational trust, not strictly private, and having increased learning for its object, in the category of public charities." *Washburn College v. O'Hara*, 75 Kan. 700, 703-05, 90 Pac. 234 (1907).

We conclude that the Crawshaw testamentary trust is a public charity. The decedent's will should be construed in accord with the authority cited by the Salvation Army as well as those rules of construction governing charitable testamentary trusts:

"[I]t must be kept in mind that in construing a will, courts are required to (a) arrive at the intention of the testator from an examination of the whole instrument, if consistent with rules of law, giving every single provision thereof a practicable operative effect, (b) uphold it if possible, (c) construe it to avoid intestacy when possible, (d) give all importance to the intention of the testator and (e) determine the intention of the testator when clearly and unequivocally expressed, without resort to rules of judicial construction

applicable to the interpretation of an instrument which is uncertain, indefinite and ambiguous in its terms. [Citations omitted.] *Likewise, remembered (a) that charitable trusts are favorites of the law which must be upheld whenever possible, and (b) that once it has been determined a will contains language creating such a trust other language to be found therein which is susceptible of more than one construction must be liberally construed for the purpose of carrying out the intention of the donor.* [Citations omitted.]" (Emphasis added.) *In re Estate of Porter*, 164 Kan. 92, 100, 187 P.2d 520 (1947).

As early as 1945, the Kansas Supreme Court recognized the need to treat charitable gifts in a different manner than non-charitable bequests or devises. While the intent of the testator remains of paramount concern, the determination of that intent oftentimes involves the consideration of evidence beyond the four corners of the document itself. *Shannep v. Strong*, 160 Kan. 206, 160 P.2d 683 (1945). In *Shannep*, the court was called upon to interpret provisions in the decedent's testamentary trust in favor of a named individual for the benefit of a local church in the testator's community. At the time of the probate of the will of the decedent, the church had disbanded. "In other words, the express trust lapsed. The question now is what disposition shall be made of the trust? What light does the will itself *and the stipulated facts throw upon that inquiry?*" (Emphasis added.) 160 Kan. at 211-12. Recognizing that the testator clearly intended to create a charitable trust, the question became "[w]hether he intended to create a trust for the benefit of a particular church in a particular community." 160 Kan. at 212.

*Shannep* deals with the same question we are called upon to resolve. "We frankly concede there is an apparent lack of harmony in the decisions on the question of what constitutes an intent to create a general charity or a particular charity. The tests for determining that question are not very clearly defined. The result is the question has been determined upon the basis of each particular instrument or *on the basis of the instrument itself and surrounding circumstances.*" (Emphasis added.) 160 Kan. at 214.

The Supreme Court, after careful examination of all the facts, including those facts bearing upon the decedent's relationship with the community and the fact that he had been a resident in that community for over a period of 50 years, concluded: "[W]e think his dominant purpose and intent was to aid the two par-

ticular local churches in his old hometown rather than to create a general charity for religious purposes. It was quite natural, and certainly appropriate, for an old farmer who had struggled and lived successfully in a small community for over a half a century to contribute to the welfare of his home community and old friends by aiding those two local character-building institutions which, if like most churches, are always in need of funds. In the absence of evidence disclosing any other intent we think we would be doing violence to the testator's real purpose by construing his will as intending to create a general charity for the advancement of religion." 160 Kan. at 214.

Certainly, it would be appropriate in attempting to ascertain the intent of the testator in this case to look beyond the four corners of the instrument and consider what relationship the decedent Crawshaw may have had with Marymount College. *Shannep* suggests that it is not inappropriate to consider the surrounding circumstances of the gift when faced with a question of whether the testator possessed a general or specific charitable intent. "It also is elementary that such intention must be ascertained not from any single or isolated provision, *but from all provisions contained within the four corners of the instrument and from circumstances surrounding its execution if they are needed to clarify the testator's true purpose and intent.*" (Emphasis supplied.) *Shannep*, 160 Kan. at 211.

We faced a similar situation in the case of *In re Estate of Coleman*, 2 Kan. App. 2d 567, 584 P.2d 1255, *rev. denied* 225 Kan. 844 (1978). In that case, Coleman made a number of specific bequests in his will and left the entire residuary of his estate to three charities. A problem administering the estate arose because one of the residuary beneficiaries, the College of Emporia, had closed two years before Coleman died. 2 Kan. App. 2d at 568-69. We reviewed the following facts and concluded they would support a finding of general charitable intent:

"1. The will contains no gift-over or reversionary provisons, which has been considered a factor evincing a general charitable intent. [Citation omitted.]

"2. The gift was made to the College of Emporia by name, and a gift made to a charity *by name*, without specification, reservation or limitation

as to its use is presumed to have been made for the objects and purposes for which the charity was founded. [Citation omitted.]

"3. The bulk of the Coleman estate was bequeathed to charities . . . .

"4. Dr. Coleman made specific bequests and devises to family and friends, thus indicating that he wanted what had not been set aside to individuals to be used for charitable purposes.

"5. Several will provisions indicate that Dr. Coleman was interested in Presbyterianism and higher education. . . .

"6. Extrinsic evidence shows that Dr. Coleman had no special personal relationship to the College of Emporia, other than the fact that he was probably made aware of its financial need through the fund drive conducted in the early sixties." 2 Kan. App. 2d at 576-77.

We decided, however, after consideration of the gift language, the will as a whole, and the surrounding circumstances, that there was a specific charitable intent in *Coleman* because of Coleman's knowledge of the fund drive:

"Dr. Coleman, being very active in his church's affairs during that period, was without doubt aware of and concerned about the financial plight of the college. The fact that his will was executed in 1965, shortly after the fund-raising campaign, bolsters the theory that he named the College of Emporia as a residuary legatee with the specific thought of aiding that single, particular Presbyterian college in its time of financial hardship. Also, we note that although there was no evidence of a special personal relationship between Dr. Coleman and the College of Emporia (that is, he was not an alumnus or trustee, for example), there was a special personal relationship between him and the other named beneficiaries." 2 Kan. App. 2d at 577.

With the exception of the personal relationship, the facts in this case are remarkably similar to those in *Coleman*:

1. There is no gift-over or reversionary provision in Crawshaw's will.

2. The gift was made to Marymount College to benefit nursing and other students.

3. The bulk of Crawshaw's estate was bequeathed to charities.

4. Crawshaw made specific bequests to family members, indicating that he wanted what remained to go to charity.

5. Several of the will provisions indicate a desire that the charitable gift survive if specific provisions of the trust cannot be met. If for some reason Marymount College could not accept and administer the trust, Crawshaw deemed the bequest go in trust to "the official Board or Association of said college having the legal capacity to accept and administer the herein created trust."

Arguably, Marymount Memorial Educational Trust Fund has stepped into Marymount College's shoes and could administer the trust under the terms of the original bequest since "said college does not have the legal capacity to accept and administer" the trust, and the trust fund is "the official Board or Association of said college, having the legal capacity to accept and administer such trust." Nevertheless, the clause is indicative of a desire to have the bequest survive. Further, while Crawshaw intended the bequest to benefit nursing students, he acknowledged there might not always be eligible Marymount nursing students and authorized loans to other students.

6. Crawshaw had no special personal relationship with Marymount College. He was not an alumnus, director, employee, or teacher at the college. There is also no evidence that Crawshaw had any special relationship with the Salvation Army, the other residuary beneficiary.

In *Coleman*, we held the additional factor—knowledge of the college's financial trouble—crucial in finding Dr. Coleman had a specific charitable intent rather than a general charitable intent. That crucial factor is missing in this case. There is nothing in the will or surrounding circumstances to indicate Crawshaw had any knowledge whatsoever of Marymount College's financial position. We conclude that Crawshaw's dominant purpose and intent was to aid nursing students and other students and not Marymount College. As the trial court concluded, Marymount College was only an agent for effectuating this general charitable purpose.

Having concluded Crawshaw had a general charitable intent, the next question is whether use of cy pres is appropriate. The trial court applied the provisions of K.S.A. 1990 Supp. 59-22a01, which codifies the common-law doctrine of cy pres. Bogert defines the cy pres doctrine as

"the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to revise a charitable trust where the settlor had a general charitable intent in order to meet unexpected emergencies or changes in conditions which threaten its existence." Bogert, Trusts & Trustees § 431, p. 95 (2d ed. rev. 1991).

In pertinent part K.S.A. 1990 Supp. 59-22a01 provides:

"(a) If a trust for charity is or becomes . . . impossible or impracticable of fulfillment or if a devise or bequest for charity, at the time it was intended to become effective is . . . impossible or impracticable of fulfillment, and if the settlor or testator, manifested a general intention to devote the property to charity, any judge, on application of any . . . interested party . . . may order an administration of the trust, devise or bequest as nearly as possible to fulfill the manifested general charitable intention of the settlor or testator."

Under the statute and Kansas case law, the doctrine of cy pres permits a court to implement a testator's intent and save a testamentary charitable gift by substituting beneficiaries only when these conditions are met: "First, the gift must be to a charitable organization for a charitable purpose. Second, it must be impossible, impractical or illegal to carry out the donor's stated charitable purpose. Finally, it must appear that the donor had a general charitable intent." *In re Estate of Coleman*, 2 Kan. App. 2d at 574. All three requisites are met in this case and the use of cy pres is appropriate.

Affirmed.