No. 66,889

MARK TWAIN KANSAS CITY BANK, *Plaintiff/Appellee*, v. KROH BROTHERS DEVELOPMENT COMPANY, *Defendant*, and JOHNSON COUNTY BANK, as TRUSTEE OF THE KROH FOUNDATION, and THE KROH FOUNDATION, *et al.*, *Defendants/Appellants*.

(829 P.2d 907)

Opinion filed April 10, 1992.

*Robert F. Bennett*, of Bennett, Lytle, Wetzler, Winn & Martin, of Prairie Village, argued the cause, and *Patricia A. Bennett*, of the same firm, was with him on the briefs for appellants Johnson County Bank and the Kroh Foundation.

*H. David Barr* and *J. Patrick Shepard*, of Gage & Tucker, of Overland Park, were on the briefs for appellants Michael K. and Elinor K. Tourtellot.

*Gordon E. Wells, Jr.,* of Lathrop & Norquist, of Overland Park, argued the cause, and *John L. Vratil* and *Laura J. Bond,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is an action for quiet title and declaratory judgment by Mark Twain Kansas City Bank (Mark Twain) against Kroh Brothers Development Company; the Kroh Foundation; the foundation's Board of Control; Johnson County Bank, as trustee of the Kroh Foundation (Trustee); and others. All material parties moved for summary judgment. The district court granted Mark Twain's motion and denied all others. The Trustee,. the Kroh Foundation, and the members of the Board of Control appealed.

The material facts in this case are not in dispute and were stipulated to in the district court. They are as follows:

John A. Kroh, Sr., was an original owner of Kroh Brothers Development Company, a Missouri corporation with offices in Kansas City, Missouri. His wife was Elizabeth Kroh. They had three children, George P. Kroh, John A. (Jack) Kroh, Jr., and Elinor Kroh Tourtellot. In 1957, John A. Kroh, Sr., established a trust entitled The Chatham Foundation. The Johnson County National Bank & Trust Company (now Johnson County Bank, N.A.) was the sole trustee.

The Chatham Foundation was established as a vehicle through which charitable donations could be made. The trust agreement provided Johnson County Bank, as trustee, would have no authority to determine and make charitable contributions except upon specific direction of the foundation's Board of Control. The trust specifically provides: "The Board of Control may . . . conduct, directly or indirectly through other organizations or groups, such activities as the Board of Control deems advisable . . . ." The original Board of Control was composed of John A. Kroh, Sr., Elizabeth Kroh, and attorney W. B. Cozad.

In 1970, John A. Kroh, Sr., and Elizabeth Kroh resigned as members of the Board of Control. Their sons, George and Jack, were appointed to fill their positions. Arch Wheeler, an officer and director of Kroh Brothers Development Company, became a member of the Board of Control in 1971 or 1972. In 1974, the

name of The Chatham Foundation was changed to the Kroh Foundation.

During the period from 1957 to 1970, the Board of Control determined the nature and extent of charitable donations and how assets of the Kroh Foundation were to be invested, managed, sold, and reinvested. During that period, the Trustee wrote checks and paid expenses as instructed by the Board of Control. Beginning in 1977, general administrative work for the Kroh Foundation was carried out by Jenna Garretson, Jack Kroh's secretary and a Kroh Brothers Development Company employee. Garretson took over those duties from Wheeler who remained an inactive member of the Board of Control.

In September 1980, Freda Whitaker became an officer at Johnson County Bank and was primarily responsible for the Kroh Foundation account. At that time, its assets were a small bond, a small amount of cash, and some common funds. The Trustee exercised no independent discretion as to charitable contributions. Prior to 1987, the only investments the Trustee independently made on behalf of the Kroh Foundation was the investment of excess cash. Whitaker received and followed instructions from individual members of the Board of Control, as well as from Garretson. Whitaker considered Garretson's instructions as coming from the Board of Control.

When Elizabeth Kroh died, she left $300,000 to the Kroh Foundation. Three $100,000 certificates of deposit were purchased with this money; however, they were not titled in the name of the Trustee but in the name of the Kroh Foundation. The Trustee received the interest from the CD's. The Trustee was aware of how the CD's were titled and wrote Garretson, stating, "[T]hese Certificates of Deposit should be held by our Bank since we are the trustee for the foundation and probably should be holding the assets of the foundation." The Trustee finally obtained possession of the CD's in 1987.

In 1983, a brochure was prepared for the Kroh Foundation. It listed John, Jack, George, and Elizabeth Kroh as directors and Garretson as assistant secretary. The brochure stated the Kroh Foundation was "incorporated under the laws of Kansas," although the Kroh Foundation was never incorporated. Jack Kroh submitted invoices for the cost of designing and printing the

brochure to Whitaker. The Trustee paid the invoices. The brochure was not widely distributed and Whitaker did not receive a copy.

In April 1981, John A. Kroh, Sr., and Elizabeth Kroh executed a deed conveying the real property at issue in this lawsuit to "the Kroh Foundation, a not-for-profit charitable organization." The deed conveying the property on April 17, 1981, was delivered to the Trustee in August 1981. The deed was thereafter listed and carried as an asset of the Kroh Foundation on the Trustee's books. This deed was recorded with the Register of Deeds on April 20, 1981.

It was the general practice of the Trustee to hold assets of a trust for which it was trustee in the bank's name, as Trustee, or in the nominee's name. Despite this policy, the property remained in the name of the Kroh Foundation. At the time it was transferred to the Kroh Foundation, the property was subject to a mortgage in favor of Farm & Home Savings.

Once the property was transferred to the Kroh Foundation, the Trustee paid the mortgage and taxes. The Trustee was not involved in collecting rent or managing the property, but left that function to Kroh Brothers Development Company. On an irregular basis the Trustee received payments that it was told were rents from the property.

In 1986, Mark Twain solicited loan business from Kroh Brothers Development Company. At this time Jack and George Kroh each owned 50% of Kroh Brothers Development Company. Jack Kroh wrote to Ed Enloe, president of Mark Twain, requesting a loan to "refinance" several properties, including the real property at issue in this case. On February 19, 1986, the Executive Loan Committee of Mark Twain approved credit of $4.4 million to Kroh Brothers Development Company "to purchase seven properties from Kroh Bros. Foundation."

In March 1986, Garretson wrote a letter to Scott Spiker, a loan officer at Mark Twain, stating in part:

"In regard to the Kroh Foundation property, as I mentioned to you yesterday, we can either transfer the property into Kroh Brothers Development Company and realize considerable tax consequence or we can transfer the property into an entity of which Kroh Brothers has less than 30% interest. Roger Phillips of the Jackson, Dillard firm tells me we can form

a Kansas general partnership, which does not have to be filed with the Secretary of State as a limited partnership would, and transfer the building into that entity, transferring it at a later date into Kroh Brothers Development Company. This would involve another borrower where this loan is concerned."

Thereafter, Jack Kroh created 10770 El Monte Associates (general partnership). This partnership was made up of Kroh Brothers Development Company, as the managing partner holding a 30% interest, and Garretson and Jacob Mondschein, employees of Kroh Brothers Development Company, each with 35% partnership interests. Mondschein and Garretson characterized themselves in their depositions as "straw partners" to be "used sort of as placeholders until moneyed equity partners could be obtained."

Prior to the transfer of the property from the Kroh Foundation to the general partnership, the Chatham Foundation trust agreement, together with all its amendments, was sent to Mark Twain. The individuals at Mark Twain indicated that they "thought" they had read it, and that they had "skimmed" it, yet no inquiry was made to the Trustee regarding the proposed transaction.

After reviewing the trust document, Spiker determined Mark Twain needed "a letter of opinion from the borrower as well as title coverage to show that that had been legally conveyed." As a result, Mark Twain obtained an opinion letter from a Kroh Brothers Development Company attorney, a commitment for title insurance, minutes of a Kroh Brothers Development Company board meeting and a corporate resolution of Kroh Brothers Development Company authorizing the subject transaction. In addition, Mark Twain asked for a letter to be signed by the Board of Control. In response, a letter on Kroh Foundation letterhead stationery, signed by John, George, and Jack Kroh, as the Board of Control, was provided to Mark Twain. The letter states in part:

"Please let this letter serve as your confirmation that the Board of Control of Kroh Foundation is aware of and does approve the sale of the property located at 10770 El Monte, Overland Park, Kansas, currently owned by the Foundation, to Kroh Brothers Development Company for a purchase price of $750,000.

"The purpose of this transaction is to allow the Foundation to have liquid assets for its contributions rather than relying on the income from this property.

"If you have any questions regarding this transaction, please feel free to contact any of us."

On March 31, 1986, a real estate contract was signed by Jack Kroh on behalf of the Kroh Foundation. This contract stated the property was being sold to the general partnership.

The closing took place on April 2, 1986. Though no such corporation existed, a corporation warranty deed for the property was used which states the real property was being conveyed from the Kroh Foundation, "a corporation, duly organized, incorporated and existing under and by virtue of the laws of the State of Kansas" to 10770 El Monte Associates. The deed was signed by Jack Kroh as "trustee."

On April 2, 1986, the general partnership executed and delivered a promissory note in the original amount of $753,280. It also executed and delivered a mortgage on the property to Mark Twain. The mortgage was recorded with the Register of Deeds. Mark Twain advanced to the custodial account of Chicago Title Company in Kansas, by wire transfer, the sum of $753,280 together with other funds on other loans being made by Mark Twain to Kroh Brothers Development Company on the other properties. A portion of the general partnership's loan proceeds was used by Chicago Title to pay off the existing mortgage on the property. Mark Twain instructed Chicago Title by letter that the remainder was "to be disbursed to the seller pursuant to their instructions."

Garretson, on the request of Jack Kroh, asked Chicago Title Company to place the loan proceeds, including the proceeds from the sale of the Kroh Foundation property, into the Kroh Brothers Development Company account. Chicago Title Company complied with this request in spite of the letter from Mark Twain and the condition of the title. Neither Chicago Title nor anyone else involved made contact with or apprised the Trustee about this action.

The Trustee first became aware of the transaction on May 13, 1986, when an April 30, 1986, mortgage payment check to Farm & Home Savings was returned to the Trustee indicating the mortgage had been paid in full. Whitaker then called Garretson to find out what had happened. Garretson told her the loan had been paid and when asked by Whitaker to provide more infor-

mation, Garretson told Whitaker she would provide her with the documentation. Garretson provided Whitaker with no more information, and Whitaker contacted James Deberry, legal counsel for the Trustee.

Deberry made phone calls to attorneys for Kroh Brothers Development Company with no result. At the end of June 1986, the Trustee received a copy of the deed and contract for sale of the property from Roger Phillips, attorney for Kroh Brothers Development Company. During the next several months Deberry had numerous telephone conversations with attorneys for Kroh Brothers Development Company "attempting to get information on the status of the situation." The Trustee, through attorney Deberry, made a number of attempts to find out "[w]hen [the Trustee was] going to get the money." No one contacted the Board of Control or any of the Krohs personally to discuss the transaction after they became aware of the sale of the property. The Trustee did not know who the principals of the general partnership were or that a mortgage on the property had been executed in favor of Mark Twain until early 1987.

In July 1986, the general partnership assigned its interest in the real property to 10750 El Monte Associates (limited partnership), composed of Kroh Brothers Development Company as general partner and Garretson and Mondschein as limited partners.

In early November 1986, the public became aware of Kroh Brothers Development Company's financial problems. On February 13, 1987, Kroh Brothers Development Company, Jack Kroh, George Kroh, and the limited partnership filed voluntary petitions for bankruptcy under Chapter 11 of the United States Bankruptcy Code. In October 1987, Deberry filed a proof of claim in the bankruptcy of the limited partnership on behalf of the Kroh Foundation "to quiet title of real property in creditor's name or unliquidated money judgment believed to be about $753,280.00, less mortgage payments paid, plus reasonable rental payments on said property."

On May 12, 1987, Wheeler, George Kroh, and Jack Kroh resigned from the Board of Control of the Kroh Foundation. At that time, a third amendment to the Kroh Foundation Trust was

executed, and John A. Kroh, Sr., Elinor Kroh Tourtellot, and Michael K. Tourtellot were appointed to the Board of Control.

Prior to the transaction, the Trustee did not object to decisions the Board of Control made regarding the Kroh Foundation. After the sale of the property, members of the Board of Control continued to refer to themselves as "trustees," to which the Trustee made no objection.

This case was initiated by Mark Twain's petition to quiet title and for declaratory judgment filed June 27, 1988. In its petition, Mark Twain joined as parties defendant Kroh Brothers Development Company, Mondschein, Garretson, the Kroh Foundation, Johnson County Bank, N.A., Jack Kroh, George Kroh, Wheeler, John Kroh, Sr., Michael and Elinor Tourtellot, the limited partnership, and the general partnership. All defendants filed answers except Jack and George Kroh, who were found to be in default. In their answer, the Kroh Foundation and the Trustee sought to have the court quiet title to the property in the Trustee. Likewise, the El Monte general and limited partnerships filed a cross-claim seeking to quiet title to the property, as did Kroh Brothers Development Company.

In October 1989, the parties filed a Stipulation Agreement and Motion wherein they stipulated and agreed Mondschein, Garretson, and Wheeler claimed no interest in the subject property and, therefore, were to be dismissed from the action. This left Kroh Brothers Development Company; Johnson County Bank; the Kroh Foundation; and Michael and Elinor Tourtellot, and John A. Kroh, Sr., individually and collectively as the Board of Control of the Kroh Foundation, as defendants. The parties agreed the property should be sold for the sum of $950,000 and the net proceeds held by the District Court of Johnson County. The stipulation was approved by the court and the property was thereafter transferred to the new buyer. The proceeds of the sale were invested under the terms of the stipulation and are held by the court.

All remaining parties submitted motions for summary judgment by March 1990. At the request of the district court, the parties filed a stipulation of facts on September 6, 1990.

The district court found the Trustee ratified the sale to the general partnership and, thus, the subsequent mortgage of the

real property to Mark Twain was valid. The district court granted Mark Twain's motion for summary judgment and denied the Trustee's motion for summary judgment. This appeal followed. We reverse.

First let us examine the scope of appellate review. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." K.S.A. 60-256(c). To defeat a properly supported motion for summary judgment, the nonmovant must come forward with "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In this action the parties stipulated to the facts; thus, we review this case de novo because we have the same opportunity to weigh the evidence as did the district court. *Stith v. Williams*, 227 Kan. 32, 34, 605 P.2d 86 (1980).

The Board of Control argues the law of Missouri should be used to resolve this dispute, listing all the parties located in Missouri and all the activities that occurred in Missouri. It states Kansas follows the rules of *lex loci contractus* and *lex loci delicti*.

Since this issue was not raised in the district court, it is of questionable validity before us. See *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 738, 822 P.2d 617 (1991). However, because we are reviewing this case de novo we will consider the issue. The cause of action is for quiet title to real estate in Kansas. The law of the situs of the real estate is applicable. *Hanson v. Hoffman*, 150 Kan. 121, 124, 91 P.2d 31 (1939).

The Trustee, the Kroh Foundation, and the Board of Control argue the district court erred in granting summary judgment to Mark Twain and instead should have granted their motions for summary judgment. In its memorandum decision, the district court stated in part:

"As grantor, Johnson County Bank ratified the deed which was signed by 'John A. Kroh, Jr.' as 'Trustee' and which transferred property from the Foundation to the general partnership. The acts of ratification were the Bank's relative inaction over a period of six months following notice of the transfer and its primary interest in receiving the proceeds from the sale of

the property. This is evidence of an intent to ratify. It had possession of the deed and the contract for half a year. It knew what the deed looked like, it knew who signed the deed, and it had a contract of sale. The pertinent and material facts necessary to disaffirm the deed were before the trustee. Clearly, seeing the name of 'John A. Kroh, Jr.' as 'Trustee' on the deed was sufficient to signal the Bank that something was amiss. Nonetheless, Johnson County Bank did not disaffirm the deed.

"Ratification can also occur by the grantor's acceptance of benefits flowing from the deed. 29 C.J.S., Deeds § 67. Johnson County Bank as Trustee of the Foundation received the benefit of having a mortgage on the property paid off. It attempted to obtain the additional benefits of the subsequent sale of the property to the general partnership. Johnson County Bank spent six months and fifteen phone calls trying to determine when it would receive the benefits of the sale of the property. Such activity constitutes ratification."

The Trustee and the Kroh Foundation challenge the district court decision, contending the Trustee did not ratify the transaction because (1) the transfer is void under the Internal Revenue Code and at common law; (2) Jack Kroh did not purport to act as agent for the Trustee; (3) the Trustee did not have full knowledge of all pertinent and material facts; (4) the Trustee was not inactive and did not accept the benefits of the transaction; (5) there was no consideration for the ratification; (6) ratification requires the same formalities as the act being ratified; (7) Mark Twain knew or should have known of Jack Kroh's lack of authority to sign as "Trustee;" and (8) the Trustee is not estopped to deny the validity of the transaction.

The Board of Control argues the Trustee's power under the trust instrument was limited to following instructions of the Board of Control and, therefore, the Trustee had no authority to ratify the transaction. The Board of Control further contends only a party for whom an agent is purportedly acting may ratify the agent's act and when Jack Kroh signed the deed he was not acting as the Kroh Foundation's agent. Moreover, the Trustee did not have sufficient knowledge to ratify, and such ratification would leave the Kroh Foundation without the property and without the proceeds of the sale.

Let us now examine the powers and duties of a trustee conferred by statute and the trust agreement. The statutory duties of a trustee are set forth in K.S.A. 58-1203, which states in pertinent part:

"(a) From time of creation of the trust until final distribution of the assets of the trust, a trustee has the power to perform, without court authorization, every act which a prudent man would perform for the purposes of the trust including but not limited to the powers specified in subsection (c).

"(b) In the exercise of powers including the powers granted by this act, a trustee has a duty to act with due regard to the obligation as a fiduciary."

A fundamental principle of trusts is that the trustee holds legal title to the trust property. "Every sale, conveyance or other act of a trustee in contravention of a trust shall be void." K.S.A. 58-2405.

The trust agreement provides in part:

"[N]o part of the Trust Estate, either income or principal, shall revert or be distributed to or used for or inure to the benefit of (i) the Grantor, (ii) any other individual or corporate donor to the Trust Estate, (iii) any person who is a member of the family of Grantor or any such donor, as family is defined in Section 318(a)(1) of the Internal Revenue Code, (iv) any corporation controlled by the Grantor or by any such other donor, through the ownership, directly or indirectly of 50 per centum or more of the total combined voting power of all classes of stock entitled to vote or 50 per centum or more of the total value of shares of all classes of stock of such corporation . . . .

. . . .

"FOURTH: In the administration of the Trust Estate, the Trustee, with the written approval or direction of the Board of Control, is hereby authorized and empowered . . . .

. . . .

"(2) To sell, pledge, mortgage, transfer, exchange, convert or otherwise dispose of or grant options with respect to, any and all property at any time forming a part of the Trust Estate . . . .

. . . .

"The written approval or direction hereinabove required need not necessarily be limited to a specific action or transaction.

"The Trustee is hereby expressly authorized and given plenary power, in its sole and absolute discretion:

. . . .

"(f) To execute and deliver any and all instruments in writing which it may deem advisable to carry out any of the foregoing powers. No party to any such instrument in writing signed by the Trustee shall be obliged to inquire into its validity, or be bound to see to the application by the Trustee of any money or other property paid or delivered to it by such party pursuant to the terms of any such instrument.

"FIFTH: Anything contained in this Agreement to the contrary notwithstanding, no loan, investment or transaction shall be made by the Trustee or directed by the Board of Control which is defined as a 'Prohibited

Transaction' by the Internal Revenue Code of the United States . . . or which would deny to the Trust Estate exemption from taxation for income tax purposes . . . .

. . . .

"NINTH: The Trustee shall make payments out of the Trust Estate for the purpose above set forth, to persons and in amounts designated in writing by a Board of Control to be composed of three members, none of whom shall be entitled to participate in any payments made by the Trustee under this Agreement. . . . Said Board of Control in directing the Trustee to make payments for any of the purposes herein . . . shall have final and absolute discretion and authority."

Because this trust was a charitable trust, K.S.A. 79-4605 is also applicable. It provides in pertinent part:

"(1) In the administration of any trust which is a 'private foundation,' as defined in § 509 of the internal revenue code of 1954, a 'charitable trust' as defined in § 4947(a)(1) of the internal revenue code of 1954, . . . the following acts shall be prohibited:

"(a) Engaging in any act of 'self-dealing' (as defined in § 4941(d) of the internal revenue code of 1954), which would give rise to any liability for the tax imposed by § 4941(a) of the internal revenue code of 1954."

The Internal Revenue Code provides the sale, exchange, or leasing, of property between a private foundation and a disqualified person is an act of self-dealing. 26 U.S.C. § 4941(d)(1)(A) (1988). It further defines a disqualified person as:

"(A) a substantial contributor to the foundation,
"(B) a foundation manager . . . ,
"(C) an owner of more than 20 percent of—
     (i) the total combined voting power of a corporation,
     (ii) the profits interest of a partnership, or
     (iii) the beneficial interest of a trust or unincorporated enterprise,
     which is a substantial contributor to the foundation,
"(D) a member of the family . . . ,
"(E) a corporation of which persons described in subparagraph (A), (B), (C), or (D) own more than 35 percent of the total combined voting power,
"(F) a partnership in which persons described in subparagraph (A), (B), (C), or (D) own more than 35 percent of the profits interest . . . ." 26 U.S.C. § 4946(a)(1) (1988).

As previously stated, the district court determined the Trustee had ratified the transaction. The transaction, however, was in violation of the trust agreement's provisions against self-dealing and actions in violation of the Internal Revenue Code. The transaction further violated K.S.A. 79-4605, which also prohibits self-dealing. A trustee acts as a fiduciary to the trust and may only exercise those powers as provided by the trust agreement. See

*In re Estate of Sutcliffe,* 199 Kan. 686, 694, 433 P.2d 389 (1967); K.S.A. 58-1203(b). Any act by a trustee that violates the trust agreement is *void.* K.S.A. 58-2405.

A trustee cannot ratify an act that is in violation of the trust agreement because such an act is void. Thus, the Trustee did not ratify the acts of Jack Kroh. The district court's ruling was in error.

The hardship for Mark Twain was brought on by its own actions. Numerous red flags of warning were raised. Mark Twain had a copy of the Trust Agreement which clearly prohibited self-dealing. It knew the trust was not a corporation, yet a corporation warranty deed was used. It knew Jack Kroh was not the trustee but accepted his signature on the deed and mortgage. It knew Johnson County Bank was trustee for the Kroh Foundation. Mark Twain ignored all signals of irregularity. Certain third persons enjoy protections under K.S.A. 58-1207 and K.S.A. 58-2402 when dealing with trustees. Mark Twain does not qualify for such protection. It is a sophisticated investor. It had been advised the general partnership was formed in order for Kroh Brothers Development Company to avoid "considerable tax consequence." Mark Twain also had a copy of the agreement of the general partnership. Having received a letter from Garretson, Mark Twain should have been alerted to the fact that Garretson was an employee of Kroh Brothers Development Company and was acting as a straw partner in the general partnership.

■ We now determine where the title to the property is vested. Mark Twain argues the conveyance of real estate to the Kroh Foundation was void because unincorporated charitable organizations lack the capacity to take title, citing *In re Estate of Loomis,* 202 Kan. 668, 672, 451 P.2d 195 (1969). *Loomis* held a devise of property to an entity which is incapable of taking is void. *Kansas Private Club Assn. v. Londerholm,* 196 Kan. 1, 3, 408 P.2d 891 (1965), held individuals and corporations are the only legal entities recognized by Kansas, in the absence of qualifying statutes.

There is authority for courts to exercise their equitable powers to carry out a donor's intentions. See Restatement (Second) of

Trusts § 397 (1957), which provides in pertinent part: "(1) Except as stated in Subsection (2), a disposition for charitable purposes will not fail because of the failure of the trustee to act or for want of a trustee." The Comment to § 397 states in pertinent part:

"(f) *Direct gift to unincorporated charitable association.* If the owner of property devises or bequeaths it to an unincorporated charitable association, a charitable trust may be created although the purposes of the trust are not mentioned in the will. If the association is incapable of taking title to the property and administering the trust, the court will appoint a trustee to take the title and administer the trust for the purpose of the association."

We applied the principle stated in Restatement (Second) of Trusts § 397 in *Barnhart v. Bowers*, 143 Kan. 866, 57 P.2d 60 (1936). In *In re Estate of Crawshaw*, 15 Kan. App. 2d 273, Syl. ¶ 2, 806 P.2d 1014 (1991), the Court of appeals held: "[W]hen it is ascertained that the donor intended to create a public charity, the conveyance or bequest will not be allowed to fail because the trustee is incapable of taking." See also *Trustees of Endowment Fund of Hoffman Memorial Hosp. Ass'n v. Kring*, 225 Kan. 499, 503-04, 592 P.2d 438 (1979), where the cy-pres doctrine was applied to carry out a grantor's intent when a trust established by the grantor failed.

John and Elizabeth Kroh deeded the property to the Kroh Foundation. Neither John nor Elizabeth Kroh's representatives claim any interest in the property. Although the deed was not in the name of the Trustee, the legal title vested in the Trustee, Johnson County Bank, and there it remains. We so hold, by authority of our equitable powers to liberally construe an instrument to carry out the intention of the donor. See *In re Estate of Crawshaw*, 15 Kan. App. 2d 273.

In light of our decision, we need not address the other issues raised.

We hold the district court erred in granting summary judgment to Mark Twain. It should have granted summary judgment to Johnson County Bank and the Board of Control. Title to the property is quieted in Johnson County Bank as Trustee of the Kroh Foundation, and, in accordance with the stipulation and agreement, the district court is ordered to pay the proceeds of the real estate sale to Johnson County Bank.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.